A. C. BARRON, Appellant,

v.

Kenneth R. MARUSAK, Appellee.

No. 10971.

Court of Civil Appeals of Texas.

Austin.

May 30, 1962.

Rehearing Denied June 20, 1962.

78

J. W. Thomas, Belton, J. W. Thomas, Jr., Temple, for appellant.

Cox, Brown & Daniel, Temple, for appellee.

HUGHES, Justice.

This is a suit for damages brought by appellant, A. C. Barron, for the death of his twelve year old son, Tony Barron, allegedly caused by the negligence of appellee, Kenneth R. Marusak.

Trial commenced to a jury but upon appellant resting his case, the Court instructed the jury to return a verdict for appellee. In accordance with such verdict, judgment was rendered that appellant take nothing by his suit.

In passing upon the propriety of the Court's action in instructing a verdict, we will view the evidence in a light most favorable to appellant, indulging against the instruction every inference that may be properly drawn from the evidence, and if the record reflects any testimony of probative force in favor of appellant, we must reverse and remand this cause for trial. White v. White, 141 Tex. 328, 172 S.W.2d 295.

Tony Barron was killed when struck by a car driven by appellee. The tragedy occurred just outside the City limits of Belton, in Bell County, on U. S. Highway 190 at about 6:30 P.M., after dark, on December 17, 1960.

The Highway right of way is one hundred feet wide, the paved portion being forty one feet. It runs in an easterly and westerly direction. There is a center white line dividing the highway. The shoulder of the road is partly graveled. Beyond the shoulder is a slightly depressed area called a "bar" ditch in which weeds grow. The road was fairly straight and had but very little grade. It was smooth, regular, and vision of drivers was unobstructed.

There was a fireworks stand, called "Shack", about ten feet from the paved portion of the highway and on the south side. Also on the south side of the highway in the vicinity of the shack were a cafe, a filling station and the Ford Motor Company.

Tony, his sixteen year old brother Richard, and a friend thirteen years old, Louis Luna, shortly before the accident, crossed the highway from the north side to the south side for the purpose of buying fireworks from a young girl who had her stand in the shack. After the purchase, the two older boys crossed the highway at a point where no pedestrian crossing was marked. Tony lagged behind, and returned to the shack. We quote now from the testimony of Richard Barron:

"A  He went back to the fireworks stand.

"Q  Where were you at the time when he went back?

"A  Well, we were halfway across the road.

"Q  You were over on the north side, that is across the road?

"A  Yes.

"Q  Waiting for him?

"A  Yes.

"Q  All right, and then what happened, * * *?

"A  Well, he started back to where we were at and he stopped at the end

of the road to see in both directions to see if a car was coming.

\* \* \* \* \* \*

"A And then he started back.

"Q All right. He started back across the highway.

"A Yes, sir.

"Q All right, and then what happened?

"A Well, he stopped and looked in both directions and then after I seen that he had looked in both directions I turned my face to talk to the other boys, and he started across the road after he had seen both directions.

"Q He started across the road, back where you were standing?

"A Yes.

\* \* \* \* \* \*

"Q Tell this jury how he started back, whether he was running or walking, or how he started back across the road.

"A Walking.

\* \* \* \* \* \*

"Q You did not see the car strike him?

"A I only seen the car dragging him, that is all I seen.

"Q You saw the car dragging Tony?

"A Yes, sir.

"Q All right. Do you know when a car is running fast or when it is running slow?

"A Yes, sir.

"Q Was that car running fast or slow?

"A He was running pretty fast.

"Q It was running pretty fast while it was dragging your brother?

"A Yes, sir.

"Q How far did it drag him?

"A Well, he dragged him from the fireworks stand close to that cafe.

\* \* \* \* \* \*

"Q Now, Mr. Seaman, the surveyor, said it was ten feet from the edge of the highway to the fireworks stand, so if Tony was five feet from the highway then he was in fact about half way between the fireworks stand and the road, isn't that right?

"A Yes, sir.

"Q And that is where he was the last time you saw him, is that right?

"A I kept looking up there where he was at and he was counting the fireworks and sticking them in his pocket, and he stopped there about five feet away from the highway. Then he walked close to the highway and he stuck everything in his pocket and that was when he started back, you know.

"Q That was when he turned and went back to the fireworks stand?

"A No, that was when he looked in both directions. He had already looked once and then he looked again and then he started across, and that was when I turned my face to talk to the boys.

\* \* \* \* \* \*

"Q Now, Richard, I believe you said that Tony was right at the edge of the highway the last time you saw him?

"A Yes, sir."

The testimony of Louis Luna was substantially the same as that of Richard Barron. They were the only on-the-scene witnesses who testified. Neither heard or saw the approaching car which hit Tony. Neither saw the car hit him.

Appellee testified as an adverse witness. He was a single man stationed at Fort

Hood. He was driving a 1957 Ford. He was enroute from Fort Hood to Temple for relaxation. About half a mile before he reached the shack he stopped his car to examine its tires. We quote his testimony:

"A  Well, as I approached Belton I saw two figures going across the highway and I automatically alerted myself more, and I was ready to slow down if they should change their direction and go back the way they were coming from, so that I would have time to stop for them.

"Q  You say you saw some children in the roadway?

"A  I seen two figures, sir.

"Q  How far back were you?

"A  About 400 feet, sir.

"Q  About 400 feet?

"A  Yes, sir.

*  *  *  *  *  *

"Q  Small, they were small figures?

"A  Yes, sir.

"Q  How were they crossing the highway? Which way were they going?

"A  They were going from the south to the north, sir.

"Q  South and north?

"A  South to north, sir.

*  *  *  *  *  *

"Q  This is a good representation of that road, isn't it.

"A  Yes, sir.

"Q  It shows to be level?

"A  Yes, sir.

"Q  And almost straight?

"A  Yes, sir.

"Q  The atmosphere was clear?

"A  Yes, sir.

"Q  There was no car ahead of you, between you and the two figures in the road as you express it? There wasn't any car between you and those figures, was there?

"A  No, sir.

"Q  And the road was clear?

"A  Yes, sir.

"Q  Nothing to obstruct your view?

"A  No, sir.

"Q  At all?

"A  No, sir.

"Q  And you saw those figures?

"A  Yes, sir.

"Q  As you express it, in the road ahead of you?

"A  Yes, sir.

"Q  Going across the highway?

"A  Yes, sir.

"Q  Did you see a fireworks stand at that time?

"A  No, sir.

"Q  How fast were you driving?

"A  Between thirty five and forty miles an hour, sir.

"Q  Mr. Marusak, couldn't it have been fifty five or sixty miles? You were not watching your speedometer, were you?

"A  No, sir.

"Q  Well, I don't know, but I want you to tell this jury how you concluded that you were driving thirty five to forty miles an hour. You were not watching your speedometer?

"A  Well, sir, when I started up after stopping I knew I was coming to a town or a business district and I did

not try to get up to fifty five miles an hour. I knew that I would have to go through the town fairly slow and it was not the same as on an open highway.

"Q You did know that it was your duty to slow down and to drive at a reasonable rate of speed, didn't you?

"A Yes, sir.

"Q You knew that?

"A Yes, sir.

* * * * * *

"Q Well, what brought it to your attention that it was a crowded section?

"A I knew it was from coming up there before, but I knew there were not houses on both sides of the road, or buildings.

"Q Well, they were on the right side. Do you remember that they were on the right side of the road?

"A Yes, sir.

* * * * * *

"Q All right. What did you do after you saw those figures with reference to keeping your eye on the road?

"A I continued to keep my eye on the road and I lifted up on the gas a little and prepared for anything that would happen in case they reversed their direction.

"Q That put you on notice?

"A Yes, sir.

"Q That there were, and I am pleased to call them children and you call them figures, but it put you on notice that there were small objects in the roadway ahead of you?

"A Yes, sir.

"Q Now, Mr. Marusak, when did you next see a figure in the road?

"A Whenever I struck Tony, sir.

"Q Sir?

"A Whenever I struck Tony.

"Q When you struck him?

"A Yes, sir.

"Q You hit your brakes, didn't you, before you did strike him?

"A No, sir.

"Q You didn't?

"A No, sir.

* * * * * *

"Q Why didn't you see the boy? You can't tell this jury why it is that you did not see him, can you?

"A I seen him when I hit him, sir.

"Q You saw him when you hit him?

"A Yes, sir.

"Q Then what did you do?

"A I continued on until I knew I was past the boy before I put my brakes on.

"Q You knew that you had hit him?

"A Yes, sir.

"Q How far did you go before you stopped your car?

"A About fifty or sixty yards, sir.

"Q About sixty yards?

"A Yes, sir.

"Q And that is about one hundred eighty feet?

"A Yes, sir.

"Q Can you tell this jury why you did not stop earlier?

"A Well, for the first part I was dragging the boy and I did not want to stop the car on him, or to take a chance as I passed over him that the

wheels should do so, and would drag him further. I felt my right wheel pass over the boy and then I applied my brakes when I knew he was out from underneath my car."

Appellee testified that his vision was good. The headlights of his car were burning. No defects in the car were claimed.

At a pre-trial hearing the Court sustained special exceptions made by appellee to allegations in the pleadings of appellant, the nature of the pleading and exception being reflected by the exception which we quote:

"1. Defendant specially excepts to the allegations contained in numbered paragraphs 2 and 9 of plaintiff's first amended original petition which seek to establish negligence or a negligence per se on the part of defendant with reference to an allegation to the effect that the legal and authorized speed limit at the time and place of such accident was thirty (30) miles per hour because it is alleged that the area at which such collision occurred was a 'business district' within the definition of Article 827a, Section 8, subsection [1] (b) Penal Code. In this connection defendant alleges and avers that at the time and place of such accident the authorized and posted speed limit applicable for the automobile driven and operated by defendant, on said road and in the direction in which defendant was traveling was sixty (60) miles per hour during the day time and fifty-five (55) miles per hour during the night time and that such posting of such prima facie speed limit was as authorized and posted by the authority of the State Highway Commission under the provisions of Article 827a, Section 8, Penal Code.

"In this connection further defendant alleges and avers that such defendant and all other drivers of automobiles on the State Highways within the State of Texas are, were and of necessity must be governed by the applicable speed limits as authorized and posted by the said State Highway Commission and that it would be an unconstitutional, impractical, arbitrary and foolish requirement or rule of law which would require the driver of a motor vehicle to for himself determine whether a particular area constitutes a 'business district' or a 'residential district' as such motorist proceeds along the highway, as those terms are defined in said Article 827a, Section 8, Penal Code."

In sustaining such exception the Court, in its order, recited as a predicate for such action that he had "taken judicial knowledge and notice of the posted speed limits at the place of the accident."

Appellant complains of the Court's action sustaining such exception and in taking judicial notice as indicated.

Appellee's motion for an instructed verdict was, as recited in the judgment, based on the "ground that plaintiff has not made out a prima facie case and that there was no evidence introduced by plaintiff to show any specific act of negligence on the part of defendant" and that there was insufficient evidence to show a specific act of negligence on the part of defendant.

The record does not disclose the rate of speed the Court judicially noticed as being posted. We assume that it was more than the thirty five or forty miles an hour, the speed at which appellee testified he was driving.

It is our opinion that the Court improperly took judicial notice or knowledge of the posted speed at the site of the accident, and that he improperly sustained the exception, noted above, to appellant's pleading.

Sec. 8, Art. 827a, Vernon's Annotated Penal Code, provides, in part:

"Sec. 8, Subsection 1. Speed restrictions. (a) No person shall drive

a vehicle on a highway at a speed greater than is reasonable and prudent under the conditions then existing, having regard to the actual and potential hazards when approaching and crossing an intersection or a railway grade crossing, when approaching and going around a curve, when approaching a hill crest, when traveling upon any narrow or winding roadway, or when special hazard exists with respect to pedestrians or other traffic or by reason of weather or highway conditions; and in every event, speed shall be so controlled as may be necessary to avoid colliding with any person, vehicle, or other conveyance on or entering the highway in compliance with legal requirements and the duty of all persons to use due care.

"(b) Where no special hazard exists that requires lower speed for compliance with subsection 1(a) of this Section, the speed of any vehicle not in excess of the limits specified in this subsection or established as hereinafter authorized shall be lawful, but any speed in excess of the limits specified in this subsection or established as hereinafter authorized shall be prima facie evidence that the speed is not reasonable or prudent and that it is unlawful:

"(1) Thirty (30) miles per hour in any business or residence district for all vehicles;

"(2) Sixty (60) miles per hour during the day time and fifty-five (55) miles per hour during the night time in locations other than business or residence districts for all vehicles except commercial vehicles, truck-tractors, trailers, or semi-trailers as defined in this Act and all motor vehicles engaged in this State in the business of transporting passengers for compensation or hire; * * *

" 'Business District' means the territory contiguous to and including a roadway when within any six hundred (600) feet along such roadway there are buildings in use for business or industrial purposes which occupy three hundred (300) feet of frontage on one side or three hundred (300) feet collectively on both sides of the roadway. * * *

"The prima facie speed limits set forth in this subsection may be altered as authorized in subsections 2 and 3.

"Subsection 2. Authority of State Highway Commission to alter prima-facie speed limits. (a) Whenever the State Highway Commission shall determine upon the basis of an engineering and traffic investigation that any prima-facie speed hereinbefore set forth is greater or less than is reasonable or safe under the conditions found to exist at any intersection or other place or upon any part of a highway, taking into consideration the width and condition of the pavement and other circumstances on such portion of said highway, as well as the usual traffic thereon, said State Highway Commission may determine and declare a reasonable and safe prima-facie speed limit thereat or thereon by proper order of the Commission entered on its Minutes, which shall be effective at all times or during hours of daylight or darkness, or at such other times as may be determined when appropriate signs giving notice thereof are erected at such intersection or other place or part of the highway, except that said State Highway Commission shall not have the authority to modify or alter the basic rule set forth in subsection 1(a) nor to authorize by a Commission Minute speeds for any class of vehicle in excess of the maximum values hereinbefore set forth for said class of vehicle in subsection 1(b), paragraphs (2), (3), and (4)."

It has been held that courts do not take judicial notice of the acts of the Railroad

Commission,[1] orders of the State Livestock Sanitary Commission,[2] or orders of the Commissioners Courts.[3] See also Daniels v. Ramirez, 209 S.W.2d 972, El Paso Civil Appeals.[4]

We can think of no sound reason for distinguishing between these orders and acts and the orders and acts of the State Highway Commission. Under Subsection 2, supra, we would, if judicial notice is proper, be required not only to notice the order of the Commission but also that pursuant to such order the sign had been erected.

We recognize that the doctrine of judicial notice is being liberalized and extended, Harper v. Killion, 348 S.W.2d 521, Tex. Sup. We approve this tendency. It is, however, we believe, stretching the doctrine beyond the breaking point to require a judge to judicially know the location and content of every Highway sign in his district.

■ In appellee's brief it is stated that the Trial Judge had personal knowledge of the posted signs along the highway. This is not the test. We quote from McCormick and Ray, Texas Law of Evidence, 2d Ed., Vol. 1, pp. 172, 173:

"However, it is well settled that the scope of the exercise of the function of judicial notice is not coextensive with the personal knowledge of the individual judge. Personal knowledge is not judicial knowledge. The judge may personally know a fact of which he cannot take judicial notice. Contrariwise, he may be required to notice facts as to which he has no private knowledge. * * * If the judge has personal knowledge of a fact not judicially known the proper way to make use of it is for him to take the stand as a witness and testify to what he knows."

■ In the absence of conclusive evidence that the Highway Commission has altered the prima facie speed limits as authorized by statute, supra, appellant should be permitted to plead and offer proof that the highway at the locale of this accident is a business district as defined by the statute, supra.

■ Appellee suggests that the portion of the statute calling for reduced maximum speed in business and residential districts is unconstitutional. We disagree on the authority of Eavés v. State, 353 S.W.2d 231, Tex.Ct.Crim.App. Besides, a statute may be too unreasonable, uncertain and vague to be a valid criminal statute yet valid as prescribing a rule of civil conduct. Oriental Oil Company v. Brown, 130 Tex. 240, 106 S.W.2d 136. We believe that buildings beside a highway are just as observable as highway signs. Certainly they are as visible as invisible boundaries of unincorporated towns considered and held, in Oriental, not to make uncertain and invalid for civil purposes a statute regulating speed of motor vehicles in such towns.

■ In our opinion, allegations of negligence, both statutory and at common law, and proximate cause based on speed

1. Thompson v. San Antonio & A. P. Ry. Co., 11 Tex.Civ.App. 145, 32 S.W. 427 San Antonio Civil Appeals.

2. McGee v. State, 81 Tex.Cr.R. 210, 194 S.W. 951.

3. Employers Casualty Co. v. Smith, 284 S.W. 991, Dallas Civil Appeals; A. B. C. Rendering, Inc. v. State, 342 S.W.2d 345, Houston Civil Appeals.

4. In this case the Court in discussing application of Sec. 12, Art. 827a, supra, which authorizes the Highway Department to designate through highways by stop signs stated:
"Certainly a stop sign erected without authority or maintained without it could impose no duty."
See also Mooneyhan v. Benedict, 284 S.W. 2d 741, Austin Civil Appeals, writ ref., N.R.E.

of appellee's automobile were, under this record, issuable facts for the jury.

We also believe the Court erred in instructing a verdict for the reason that there was sufficient evidence of probative value to sustain a finding that appellee was, as pled, negligent in failing to keep a proper lookout immediately before the fatal accident and that such negligence was a proximate cause of Tony's death.

We will not review in detail all of the evidence we have recited herein which sustains this conclusion. The salient factors are these: Visibility was good. The road was practically level and straight. Appellee's car was mechanically sound. Appellee knew he was driving in a commercial neighborhood. He saw two small figures cross the highway 400 feet ahead. He watched to see that they did not recross the highway, but he completely failed to observe a small 12 year old boy standing at the edge of the highway and within a few feet from the path of appellee's car.

Sec. 79 of Art. 6701d (Traffic Regulations) provides:

"Notwithstanding the foregoing provisions of this Article every driver of a vehicle shall exercise due care to avoid colliding with any pedestrian upon any roadway and shall give warning by sounding the horn when necessary and shall exercise proper precaution upon observing any child or any confused or incapacitated person upon a roadway."

Appellee saw children upon the highway at a distance of four hundred feet. He failed to see a child within, at most, ten feet from him. Appellee gave no warning by sounding the horn. We believe that a jury might reasonably find from these facts that appellee failed to "exercise due care to avoid colliding with" Tony Barron, a child pedestrian who was then upon the roadway appellee was traveling.

Sec. 79, supra, by its terms, prevails over preceding Sec. 78(a) providing, in part, that pedestrians crossing a roadway at any point other than a marked crosswalk shall yield the right of way to all vehicles upon the highway.

The judgment of the Trial Court is reversed and this cause is remanded for trial.

Reversed and remanded.

## ON APPELLEE'S MOTION FOR REHEARING

We quote from appellee's motion for rehearing:

"This Honorable Court seems to hold that appellee 'failed to observe a small 12 year old boy standing at the edge of the highway and within a few feet from the path of appellee's car', but appellee says that the record does not justify this holding. There is nothing in the record to correlate the time that Tony's brother saw him standing at or near the south side of the highway, in relation to the time that appellee's car approached the scene of the accident. Appellee says that insofar as the record is concerned that Tony might have, and probably did, return again to the fireworks stand after his brother last saw him, and then *ran* out in front of appellee's car."

Richard, Tony's brother, on cross examination by counsel for appellee testified:

"Q How long was it, Richard, from the time you last saw Tony until you heard the car hit him, and you did hear the car hit him, didn't you?

"A I did hear it.

"Q How long was it? Was it just about like that (snaps finger)?

"A It was real quick when I turned around to see him but he was already being dragged.

"Q Was it just a moment or two?

"A Yes, sir.

"Q Is that fair to say?

"A Yes, sir.

\*    \*    \*    \*    \*    \*

"Q And you say that Tony looked to his left and to his right?

"A Yes, sir. I saw Tony look in both directions and then before I turned my face around I looked that way and there was no car coming, and that was when I turned around and talked to the boys.

\*    \*    \*    \*    \*    \*

"Q But just a moment after you turned back to talk to Louis and Joe and the other boy, you heard the car strike Tony, is that correct?

"A Yes, sir."

The motion is overruled.

Motion overruled.